**STATE of Missouri, Respondent,**

v.

**Jeremy R. CARTER, Appellant.**

**WD 79529**

Missouri Court of Appeals,
Western District.

OPINION FILED: July 11, 2017

Richard A. Starnes, Jefferson City, MO, for respondent.

Damien De Loyola, Kansas City, MO, for appellant.

Before Special Division: Cynthia L. Martin, Presiding Judge, Lisa White Hardwick, Judge and Karen King Mitchell, Judge

Cynthia L. Martin, Judge

Jeremy Carter ("Carter") appeals from the trial court's entry of judgment convicting him of four counts of first-degree robbery and four counts of armed criminal action. Carter argues that the trial court erred in failing to sever his charged offenses and declare a mistrial following the State's closing argument because the trial court had a continuing duty to prevent prejudice after denying his motion to sever offenses. The State argues that Carter's appeal should be dismissed based on application of the escape rule. We affirm the trial court's judgment.

**Factual and Procedural Background**

The State charged Carter with four counts of first-degree robbery and four counts of armed criminal action. The State charged two counts of first-degree robbery and two counts of armed criminal action (Counts I-IV) based on an alleged armed robbery on April 21, 2014. The State levied the same charges—two counts of first-degree robbery and two counts of armed criminal action (Counts V-VIII)—based on a similar armed robbery on April 25, 2014.

Prior to trial, Carter moved to sever Counts I-IV from Counts V-VIII. Carter argued that severance was required because he was identified in the robbery surrounding Counts I-IV, but not in the robbery in counts V-VIII, permitting the jury to wrongfully infer that Carter was involved in both robberies. Carter also argued for severance because he would likely raise an alibi defense against Counts I-IV but exercise his right against self-incrimination on Counts V-VIII, and because joinder of all counts could confuse the jury. The trial court denied Carter's motion. Carter renewed his motion to sever before the start of trial, and asked that the "request to sever the cases be continuing throughout the entire trial, because [the trial court] theoretically [has] discretion down the road ... to sever." The trial court denied Carter's renewed motion.

The jury convicted Carter on all eight counts. Carter does not challenge the sufficiency of the evidence to support the convictions. Viewed in a light most favorable to the jury's verdict,[1] the evidence at trial established the following:

Prior to April 2014, Andrew Njogu ("Andrew") had known Carter for at least one year, but only knew him as "J."[2] Andrew met Carter through Craigslist, where Andrew sought to purchase phones to send to

---

1. "On appeal from a jury-tried case, we view the facts in the light most favorable to the jury's verdict." *State v. Williams*, 420 S.W.3d 713, 715 n.1 (Mo. App. W.D. 2014).

2. We refer to Andrew Njogu and his brother, Charles Njogu, by their first names to avoid confusion, but do not intend any disrespect or familiarity.

relatives in Kenya. Andrew met with Carter approximately ten times through the year preceding April 2014 in order to purchase phones.

Andrew tried to buy phones from Carter over the weekend prior to April 21, 2014, but learned upon meeting Carter that someone else had the phones. Eventually, Andrew left because the person with the phones never showed up. On that day, Carter drove a maroon, reddish car.

On April 21, 2014, Carter told Andrew that he had phones to sell. They agreed to meet in a large parking area near a gas station and shopping center. Andrew went to meet Carter along with his brother, Charles Njogu ("Charles"), and Charles's two-year old daughter. Charles drove Andrew's car, and Andrew rode in the passenger seat.

On the way, Andrew told Charles to look for a red car. Upon arriving at the designated meeting spot, Andrew saw a red Kia and told Charles "that's them." Andrew and Charles saw two African-American males in the red car. Andrew recognized Carter in the driver's seat. Carter's passenger was eventually identified as Ricky Bowman ("Bowman"). Andrew and Charles both noticed that Carter was leaning back in his seat.

Bowman exited the red car and approached Andrew's car, carrying a bag. Andrew exited his car, but Bowman directed him back into the car. Bowman got into Andrew's car and asked if they were there for the cell phones. Then, Bowman pulled a gun from his bag,[3] and pointed it at Andrew and Charles. Bowman told the brothers to put everything they had in the bag. Each brother put his cell phone in the bag. Andrew had $1,000 in cash that he

also put into the bag. Andrew had an additional cell phone that he tried to put in the bag, but he dropped it. Andrew stepped out of the car so that he could retrieve the dropped phone. Bowman stepped out of the car, too, and told Andrew not to try anything. Bowman walked back to the red car, and it drove away.

Andrew and Charles tried to follow the car to record the license plate number, but could not keep up. Andrew and Charles went to a nearby fire station to report the robbery. The police arrived and took statements from both Andrew and Charles.

Andrew later provided the police with a phone number for Carter. Andrew also identified Carter and Bowman in a photo lineup a few days after the robbery. Charles could not identify either Carter or Bowman in a photo lineup, but did identify Carter at trial.

The victims of the second robbery were Zebulan Hall ("Hall") and his wife's cousin, Soupaphone Apsayarath ("Apsayarath"). Apsayarath was going to visit family in Laos, and he wanted to bring them cell phones as gifts.

On April 25, 2014, four days after the robbery of Andrew and Charles, Hall found an advertisement on Craigslist offering five cell phones for $1,500. Hall contacted the seller via text messages with the phone number posted on the advertisement. Hall and the seller arranged to meet at a Wal-Mart parking lot, a location picked by the seller. The seller told Hall that he would be in a red Kia.

Apsayarath and Hall's wife, Vongdavanh Keovicheth ("Keovicheth"), went with Hall to meet the seller. They also brought a

---

**3.** Andrew and Charles testified differently as to when Bowman pulled the gun from his bag. Andrew stated it was when Bowman told him to get back into the car, while Charles said it was once Bowman was in the car. Either way, both witnesses testified that Bowman pulled the gun out of the bag he was carrying.

dog. When they arrived at the Walmart, they saw a red Kia parked away from the building. They parked a couple spaces away from the Kia. Keovicheth saw that the driver of the red car was leaned back in his seat. Two African-American males occupied the red Kia.

Keovicheth got out of the car and took the dog on a walk. At the same time, the passenger of the red Kia exited that car, carrying a bag. Hall exited his car, but the passenger said he wanted to show him the phones in the car. Hall sat in the driver's seat of his car, and the passenger from the red Kia got into the back seat next to Apsayarath.

The passenger then pulled a gun from his bag and pointed it at Hall and Apsayarath. The passenger told Hall and Apsayarath to put their phones and keys in the bag. Hall argued with the passenger about what he was doing, but eventually relented after the passenger pointed the gun back and forth between Hall and Apsayarath. Hall put Keovicheth's phone in the bag. Apsayarath put his phone in the bag, too.

The passenger began demanding money from Hall. Hall did not have any money on him. Hall and the passenger started arguing. Hall jumped out of the car to show the passenger that he did not have any money on him. The passenger exited the car, too, and told Hall not to do anything stupid. Apsayarath took this opportunity to escape the car, and ran toward the Walmart while shouting that a robbery was occurring. The passenger fled to the red Kia, which drove off.

Hall got back into his car and followed the red Kia. Eventually, Hall caught up to the Kia well enough to read the license plate number. Hall returned to the Walmart, where the police had arrived. Hall reported the license plate number and said that it was a Missouri plate. Apparently, the plate number provided was inaccurate.

However, subsequent police investigation revealed that a similar plate number was registered to a red Kia owned by a rental car company. The red Kia had been rented to Carter in March 2014. Carter's rental application listed the same phone number that Andrew had provided the police after the first robbery.

After speaking with the police, Hall acquired a temporary phone. Hall rechecked Craigslist and found that the same offer for cell phones was still posted. Hall contacted the seller from his temporary phone. Hall pretended to be an interested buyer, and set up a meeting with the seller. The seller chose the same Walmart as a meeting place. Hall contacted the police to advise of the scheduled meeting, but was informed that the police did not have the resources to safely apprehend the suspects on such short notice. Undeterred, Hall and Keovicheth went to meet with the seller again, but parked in a different parking lot so they would not be seen. Hall and Keovicheth observed the same red Kia parked in nearly the same spot as earlier in the day. Keovicheth saw two African-American males in the Kia.

To get police to the scene, Keovicheth reported a robbery at the Walmart. While waiting for the police to arrive, Hall received a phone call from the seller, and had Keovicheth answer. The seller, a male's voice, asked where Keovicheth was and told her that he needed to go soon. Keovicheth told him that she was on her way. Soon thereafter, the police arrived at the Walmart parking lot. At that point, Hall and Keovicheth left the scene.

The red Kia drove out of the Walmart parking lot. The police officers pulled the car over to conduct an investigatory stop. The officers directed the driver and passenger to exit the vehicle. As the driver exited, he placed a cell phone on the roof

of the car. The driver was Carter, and the passenger was Bowman.

A search of the vehicle revealed a handgun in Carter's seat, red and purple bags in the backseat, and a paper bag filled with clothes in the trunk. A detective on the scene arranged for a detective at the station to call the phone number used to set up the robbery of Hall, Apsayarath, and Keovicheth. The phone on top of the car rang and displayed the detective's phone number.

Hall and Keovicheth provided statements. Hall gave the police the phone number for the temporary phone he used to setup the second transaction with Carter. Hall viewed two photo lineups, but was unable to identify anyone involved in the robbery.

Detectives retrieved a log of incoming and outgoing calls from Carter's phone. The log included calls from Andrew to Carter in the days leading up to the April 21 robbery. There were also calls between Carter and Hall's temporary phone on April 25, as well as the call from the police station to Carter's phone on top of the car.

DNA testing revealed that Carter was a potential contributor to the DNA on the gun's trigger and trigger guard. Carter had already admitted the gun was his and that his DNA would be all over it.

After the close of evidence, the State made the following statement during its closing argument:

Now, we have interviews of all the witnesses, and think about all the similarities now, and Detective Findley interviews all these witnesses. A red Kia every single time; two African-American males every single time; the passenger was the gunman every single time; the driver was leaning back every single time; contacted via Craigslist; use of a bag to hide the weapon. So many similarities in what we call the MO, the modus operandi, how it all went down.

Carter did not object to this argument, request a mistrial, or renew his motion to sever. The jury found Carter guilty on all eight counts.

The trial court ordered a brief recess after the verdicts were announced and before the sentencing phase began. Carter, who was out on bond throughout the trial, failed to appear for the sentencing phase. Counsel advised that Carter was aware of the need to appear for the sentencing phase. The trial court issued a warrant for Carter's arrest. The trial court proceeded with the sentencing phase notwithstanding Carter's absence.

A supervisor of Carter's pretrial release through Jackson County House Arrest testified that she sent a text message to Carter's phone. She reported that the reply stated "I am at airport. I'm not about to spend time in jail for something I didn't do." The jury was aware that Carter was absent, and of his text message. One juror expressed concern:

[A]m I under the understanding that this person is, right now, out of custody and no one knows where he is from that text message? Because you used our names the first day, and as of right now, we're hearing that there have been threats made, and he's been in an area that's close to where I live. . . . I'd like to tell my wife to lock the doors and not open them for anybody.

Following the juror's expressed concern, Carter's counsel requested a mistrial. The trial court granted the motion, but only with respect to the sentencing phase of Carter's trial.

Carter was taken back into custody two days later on October 21, 2015. A presentencing hearing was scheduled for December 17, 2015. Prior to that date, the

State moved for a continuance because two witnesses, Andrew and Charles, were scheduled to be out of the country. Carter later waived jury sentencing. The trial court sentenced Carter to a ten-year term of imprisonment on each robbery conviction and a three-year term of imprisonment on each armed criminal action conviction. The trial court ordered all of these sentences to run concurrently.

Carter filed a motion for new trial on January 22, 2016 which raised as claimed error the trial court's failure to sever the charges related to the two robberies. The motion was denied.

This timely appeal followed.

## Analysis

Carter raises a single point on appeal. Carter claims that the trial court erred when it failed to declare a mistrial and sever Counts I-IV from Counts V-VIII following the State's closing argument which suggested that the two robberies had a similar *modus operandi*. Carter argues that this argument underscored the prejudice he suffered by not severing the charges, and effectively subjected him to conviction based on propensity evidence.

Before discussing the merits of Carter's appeal, we must address the State's argument that Carter's appeal should be dismissed based on application of the escape rule as Carter absconded between delivery of the jury's verdict and the scheduled sentencing phase of trial. Carter argues that the escape rule should not be applied to permit dismissal of Carter's appeal because Carter's escape lasted only two days and he mitigated the effect of his escape by waiving jury sentencing.

■ "The escape rule is a judicially-created doctrine that operates to deny the right of appeal to a criminal defendant who escapes justice." *State ex rel. Koster v.*

*Oxenhandler*, 491 S.W.3d 576, 604 (Mo. App. W.D. 2016) (quoting *Parsons v. State*, 383 S.W.3d 71, 73 (Mo. App. E.D. 2012)). "The decision to apply the escape rule rests within the sound discretion of the appellate court." *State v. Thomas*, 466 S.W.3d 44, 47 (Mo. App. W.D. 2015). Under this rule, "[t]his court is authorized to dismiss an appellant's appeal if the appellant absconds after conviction." *Id.*

■ "In order to decide whether to apply the escape rule, we must inquire as to whether the escape adversely affects the criminal justice system." *Id.*; *State v. Troupe*, 891 S.W.2d 808, 811 (Mo. banc 1995). "If so, dismissing the escapee's appeal is appropriate." *Troupe*, 891 S.W.2d at 811.

■ "For over a century Missouri courts have advanced rationales that justify application of the escape rule because of the adverse effect an escape has on Missouri's criminal justice system." *Id.* at 810. Some rationales for applying the escape rule include:

(1) the need for a court to have control over the defendant before making a decision on appeal; (2) curtailment of administrative problems caused by the escapee's absence; (3) preventing prejudice to the State in the event of a remand for a new trial; (4) preventing defendants from selectively abiding by court decisions; (5) discouraging escape; (6) encouraging voluntary surrender; (7) preserving respect for the criminal justice system; and (8) promoting dignified operation of the appellate courts.

*Thomas*, 466 S.W.3d at 47 (quoting *State v. Shuey*, 193 S.W.3d 811, 814 (Mo. App. W.D. 2006)).

Carter is currently under the control of the Missouri criminal justice system, and there would be no prejudice to the State in the event of a remand. However, the other

rationales put forth by our courts support applying the escape rule to Carter's appeal.

Carter's escape caused administrative difficulties and had an adverse effect on the criminal justice system. The trial court was required to issue a *capias* warrant for Carter's arrest. Law enforcement was required to commit resources to locating and apprehending Carter.[4] The sentencing phase of Carter's trial was supposed to be conducted on the same day as the guilt phase in front of the same jury. The trial court ordered a mistrial for the sentencing phase, at Carter's counsel's request, after a juror expressed fear that Carter had absconded. Invoking fear into the minds of jurors is antithetical to encouraging jury service. Though Carter was returned to custody two days after fleeing, and ultimately waived jury sentencing, he was not sentenced until March 18, 2016, five months after the time his sentencing was originally scheduled.

Carter argues that Missouri courts have applied the rule to escapes lasting at least six weeks while seemingly no Missouri court has applied the escape rule when the escape lasted only two days. However, Carter cites no authority for the proposition that application of the escape rule is inappropriate following a brief escape. To the contrary, "there is not a threshold amount of time required to permit dismissal." *Shuey*, 193 S.W.3d at 814. "The length of time is only one factor

when looking at the entire set of circumstances." *Id.* (finding that a defendant's "one-week fugitive status and five-week sentencing delay caused by his escape does not bar dismissal"). Moreover, Carter's focus on the length of his escape ignores that regardless its length, Carter's decision to abscond caused administrative difficulties and had an adverse effect on the criminal justice system, resulting in a delay in sentencing that far exceeded the six-week threshold cited in Carter's brief.

Additionally, invoking the escape rule to dismiss Carter's appeal would foster the goals of discouraging escape and promoting respect for the criminal justice system. Voluntary surrender was the very thing anticipated by permitting Carter to remain free on bond during the trial. After the guilty verdict, Carter was aware that he faced imminent sentencing and the obligation to voluntarily surrender. "Those who seek the protection of our legal system must be willing to comply with its rules and decisions." *State v. Massey*, 98 S.W.3d 105, 107 (Mo. App. W.D. 2003).

Under the circumstances, it would be appropriate to exercise our discretion to dismiss Carter's appeal pursuant to the escape rule.[5] We exercise our discretion not to do so, however, because the sole issue Carter raises on appeal is plainly without merit.[6]

Carter argues that the trial court's failure to sever was error, and should be

---

4. We recognize that "[s]ome such effect would exist in an escape case [and] Missouri does not apply a per se rule in escape cases." *State v. Surritte*, 35 S.W.3d 873, 875 (Mo. App. W.D. 2001) (citing *State v. Troupe*, 891 S.W.2d 808, 813 (Mo. banc 1995) (Limbaugh, J., concurring)).

5. In his Reply Brief, Carter argues that there is a Missouri constitutional right to appeal a criminal conviction by virtue of the open courts provision of the Constitution, and that

the escape rule implicates this right. We disagree. "The application of the [escape] rule does not violate a defendant's constitutional rights because a right to appeal a conviction does not exist." *State v. Thomas*, 466 S.W.3d 44, 47 (Mo. App. W.D. 2015).

6. We are not suggesting that the merit (or lack thereof) of an issue raised on appeal is a factor that must be considered in exercising discretion to invoke the escape rule.

reviewed for an abuse of discretion because the trial court had a continuing duty to sever his offenses if prejudice arose, rendering his pretrial request for severance sufficient to preserve his claim of error. It is true that assuming proper preservation, "[a]n appellate court will reverse the trial court's decision to overrule a motion to sever only if the court abused its discretion." *State v. Roberts*, 465 S.W.3d 899, 903 (Mo. banc 2015). The State argues, however, that Carter's claim of error was not properly preserved, and is subject only to plain error review, because Carter did not object during closing argument or renew his motion to sever after it was denied at the commencement of trial.

▮▮ We agree that Carter's claim is subject only to plain error review, though for a different reason than that articulated by the State. Carter was required to raise his claim of error in a timely filed motion for new trial in order to preserve the error for our review. *State v. Jackson*, 948 S.W.2d 138, 141 (Mo. App. E.D. 1997) (observing that general rule requires timely trial objection, assertion of same matter in motion for new trial, and raising of same matter on appeal, in order to preserve a claim of error for appellate review). Although Carter filed a motion for new trial that raised his claim of error regarding severance, the motion was not timely. Pursuant to Rule 29.11(b), a motion for new trial or for judgment of acquittal "shall be filed within fifteen days after the return of the verdict," and the trial court "may extend the time for filing of such motions for one additional period not to exceed ten days." Carter did not file a motion for a new trial or for judgment of acquittal until January 22, 2016, long after the jury's verdict was returned on October 19, 2015. *See State v. Starnes*, 318 S.W.3d 208, 215 (Mo. App. W.D. 2010) (holding

that jury's return of guilty verdict begins the time for filing a motion for new trial pursuant to Rule 29.11). Though Carter had requested that the trial court set a date for filing a motion for new trial and for judgment of acquittal when he filed pleadings confirming his waiver of jury sentencing, a trial court "has no authority to waive or extend the time for filing a motion for new trial beyond the time set forth in Rule 29.11(b)." *State v. Ess*, 453 S.W.3d 196, 201 (Mo. banc 2015). Carter's claim of error regarding severance is subject only to plain error review on appeal. *Starnes*, 318 S.W.3d at 216 (holding that untimely filed motion for new trial does not preclude plain error review). Carter's disagreement regarding our standard of review is of no import, however, as the trial court committed no error, plain or otherwise, in denying Carter's motion to sever.

▮▮ Where the joinder of offenses is proper,[7] "severance may be necessary to prevent substantial prejudice to the defendant that could result if the charges are not tried separately." *State v. McKinney*, 314 S.W.3d 339, 342 (Mo. banc 2010). "To determine whether severance is required, courts consider the number of offenses joined, the complexity of the evidence and the likelihood that the jury can distinguish the evidence pertaining to each offense." *Roberts*, 465 S.W.3d at 903. "Severance is proper only after the defendant 'makes a particularized showing of substantial prejudice if the offense is not tried separately' and after the 'court finds the existence of a bias or discrimination against the party that requires a separate trial of the offense.'" *McKinney*, 314 S.W.3d at 342 (quoting Rule 24.07). A defendant is not prejudiced by a failure to sever where evidence of the different offenses would be

---

7. Carter concedes that joinder was proper in this case.

admissible in separate trials. *Lytle v. State*, 762 S.W.2d 830, 836 (Mo. App. W.D. 1988); *State v. Williams*, 603 S.W.2d 562, 568 (Mo. 1980) (finding no prejudice from a failure to sever because "what would result in a separate trial of each offense would also result when a single trial is held of all offenses"). And where evidence of other crimes would be inadmissible in separate trials, "[a]ny prejudice from joinder 'may be overcome where the evidence with regard to each crime is sufficiently simple and distinct to mitigate the risks of joinder.'" *McKinney*, 314 S.W.3d at 342 (quoting *State v. Morrow*, 968 S.W.2d 100, 110 (Mo. banc 1998)).

Here, the evidence relating to both robberies would have been admissible in separate trials. "Generally, 'proof of the commission of separate and distinct crimes is not admissible unless such proof has some legitimate tendency to directly establish the defendant's guilt of the charge for which he [or she] is on trial.'" *State v. Naylor*, 510 S.W.3d 855, 862 (Mo. banc 2017) (quoting *State v. Vorhees*, 248 S.W.3d 585, 587 (Mo. banc 2008)). There are numerous exceptions under which inadmissible evidence of separate crimes may be admitted, including when the inadmissible evidence tends to establish "the identity of the person charged with the commission of the crime on trial." *Vorhees*, 248 S.W.3d at 588.[8] For evidence of other crimes to be admissible to prove identity, there must be "more than mere similarity" between the two crimes. *State v. Bowman*,

337 S.W.3d 679, 686 (Mo. banc 2011). The crimes "must be nearly 'identical' and the methodology 'so unusual and distinctive' that the crimes resemble a 'signature' of the defendant's involvement in both crimes." *Id.* (quoting *State v. Bernard*, 849 S.W.2d 10, 17 (Mo. banc 1993)).

Prior to the events in this case, Andrew only knew Carter as "J." Charles did not know Carter, and he could not identify Carter in a photo lineup. The victims of the second robbery also did not know Carter. Therefore, Carter's identity was at issue in both robberies.

The challenged portion of the State's closing argument addressing Carter's "*modus operandi*" was immediately followed by argument citing Andrew's relationship with Carter and his ability to pick Carter out of a lineup. The State's closing argument did not suggest Carter's propensity to commit one robbery because he committed the other. Rather, the State's argument aimed to connect Andrew's identification of Carter as the driver in the first robbery to the identity of the driver in the second because of marked similarities in the manner in which the robberies were committed. *See Vorhees*, 248 S.W.3d at 589 ("Under the signature *modus operandi* identity exception, evidence of defendant's prior criminal acts is not offered to prove his propensity to commit the charged offense. Instead, the prior acts are offered to establish the identity of the defendant as

---

**8.** Carter cites to *State v. Vorhees*, 248 S.W.3d 585, 591-92 (Mo. banc 2008), for the proposition that "[t]he identity exception tracks the now defunct *modus operandi* exception." [Appellant's Brief, p. 23] In *Vorhees*, the Missouri Supreme Court discussed "two forms of the signature *modus operandi* exception." *Vorhees*, 248 S.W.3d at 588. One was the "signature *modus operandi* identity exception," and the other was the "signature *modus operandi* corroboration exception." *Id.* at 588-92.

While *Vorhees* held that "[e]vidence of prior bad acts ... may not be admitted to *corroborate* victim testimony," the Court also held that the signature *modus operandi* identity exception had "no bearing on the case at hand." *Id.* at 589, 591. Thus, *Vorhees* invalidated the signature *modus operandi* corroboration exception, but left intact the signature *modus operandi* identity exception that is before us on Carter's appeal. *Id.* at 591.

the perpetrator of the charged criminal act.").

Undeterred, Carter argues that the methodology of commission of the robberies were not so similar as to satisfy the identity exception to admissibility of evidence of other crimes in separate trials. Carter points to the fact that Andrew had prior dealings with Carter while Hall did not. Though this is true, Carter overlooks that the relationship with both victims was formed over Craigslist. In both robberies, Carter used an anticipated transaction for the sale of multiple cell phones to lure his victims into meeting with him. Though the robberies occurred at different locations, both locations were large public parking lots, selected by Carter. Both robberies involved a red Kia, with two African-American men inside. The victims in both robberies were directed to stay in their cars by a man carrying a bag, and were ordered by that man to relinquish phones and money at gunpoint. Carter argues that keys were also demanded in the first robbery, though not in the second robbery. This distinction is relatively immaterial measured against the other striking similarities in method of commission. Put together, the circumstances of both robberies were beyond mere similarities, and were in fact nearly identical, supporting the conclusion that for purposes of establishing identity, evidence of both robberies would have been admissible in separate trials.[9]

■ Even if evidence of both robberies would not have been admissible in separate trials, any prejudice from joinder is overcome by the fact that the evidence with regard to each robbery was sufficiently simple and distinct to mitigate the risks of joinder. *McKinney*, 314 S.W.3d at 342.

Carter's eight offenses stemmed from two robberies. The robberies occurred on separate days and against separate victims. The State presented victim and witness testimony in chronological fashion and connected each witness to a separate robbery. The evidence regarding each robbery came primarily through victim and witness testimony distinct to that robbery, and was not complex. In fact, in his brief, Carter describes the robberies as "generic" and "standard." For these same reasons, the jury could distinguish the testimonial evidence pertaining to each robbery because Carter had distinct interactions with each witness on different dates.

Additionally, testimony from law enforcement officers about Carter's arrest, the photo lineups, phone call records, and DNA testing, was straightforward. Carter's arrest clearly followed the second robbery. Evidence from the photo lineups was distinguishable because the lineups were conducted with the victims separately. Evidence regarding the call logs was distinguished by connecting the victims to particular phone numbers and specific phone call dates, and by presenting separate, additional logs of each victim's individual communications with Carter. Though DNA testing demonstrated Carter's ownership and possible handling of the gun recovered following the second robbery, and no evidence could plainly connect the same gun with the first robbery, that does not suggest the jury was unable to distinguish between the evidence pertaining to each robbery.

■ Moreover, each of Carter's eight offenses was set out in a jury instruction tied to a specific date and victim. Instruction No. 48 instructed the jury that Carter

9. The parties contest other bases of admissibility, but we need not address them because evidence of the two crimes would be admissible in separate trials under the signature *modus operandi* identity exception.

was "charged with a separate offense in each of the eight counts" and that "[e]ach count must be considered separately." [10] In light of this instruction, it was not unreasonable or against the logic of the circumstances for the trial court to assume that the jury would be able to distinguish the evidence pertaining to each offense. "We assume that a jury will follow the instructions of the trial court." *Hays v. State*, 484 S.W.3d 121, 133 (Mo. App. W.D. 2015) (citing *Dorsey v. State*, 448 S.W.3d 276, 289 (Mo. banc 2014)).

Carter has not sustained his burden to establish particularized prejudice by virtue of the trial court's refusal to sever the charges related to the two robberies. Evidence of both robberies would have been admissible in separate trials to establish Carter's identity as the perpetrator. And even if not admissible in separate trials, the evidence with regard to each robbery was sufficiently simple and distinct to mitigate the risks of joinder. The trial court did not commit error, plain or otherwise, in denying Carter's motion to sever.

### Conclusion

The judgment of the trial court is affirmed.

All concur

---

10. Carter's Point Relied On asserts that the trial court erred by not stopping the State's argument and issuing a curative instruction, but Carter does not develop this in the argument section of his brief. *See State v. Nunley*, 341 S.W.3d 611; 623 (Mo. banc 2011). Regardless, any curative instruction the trial court could have issued would likely have resembled Instruction No. 48.