

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | **WD85893** |
| v. | ) | |
| | ) | **OPINION FILED:** |
| | ) | **June 25, 2024** |
| BENJAMIN DAVID WATSON, | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Clay County, Missouri**
**The Honorable David P. Chamberlain, Judge**

**Before Division Three:** Cynthia L. Martin, Presiding Judge,
Mark D. Pfeiffer and Edward R. Ardini, Jr., Judges

## Introduction

Mr. Benjamin Watson ("Watson") appeals the judgment of the Circuit Court of

Clay County, Missouri ("trial court"), following a jury trial convicting him of one count

of statutory rape in the first degree and one count of sodomy in the first degree, for which

Watson was sentenced to a total of forty years imprisonment. We affirm.

## Facts and Procedural Background[1]

The State charged Watson with one count of statutory rape in the first degree and one count of statutory sodomy in the first degree (Count I and Count II).  In Count I, the State alleged that on or between September 3, 2018, and August 15, 2020, Watson knowingly had sexual intercourse with Victim, a child less than twelve years old.  In Count II, the State alleged that, during the same time frame, Watson knowingly had deviant sexual intercourse with Victim, a child less than twelve years old, by touching her genitals with his mouth.

On January 31, 2022, the trial court took up pretrial motions, including a motion in limine filed by Watson asking the trial court to exclude "any mention of allegations of any sexual conduct or accusations made against [Watson] by others" because "[s]uch evidence is not logically or legally relevant" and should not be admissible as propensity evidence.

At the hearing, the State confirmed it intended to present propensity evidence from three other people who disclosed, after Victim came forward, they were sexually abused by Watson as children, including Watson's sister ("V.W."), Watson's brother ("T.W."), and Victim's maternal aunt ("Ta.W.").  The State detailed the propensity witnesses' allegations and argued the allegations were "very similar" to the charged offenses and, therefore, constituted probative propensity evidence.

---

[1] On appeal from a jury-tried case, the appellate court views the facts in the light most favorable to the jury's verdict.  *State v. Carter*, 523 S.W.3d 590, 593 n.1 (Mo. App. W.D. 2017).

Watson argued that "all of [the propensity evidence] is prejudicial" and that some of the allegations were "25, maybe 30 years old" and "not the same instance really at all." The trial court acknowledged that "every piece of evidence" carries some prejudicial effect but that propensity evidence is allowed under "the [Missouri] Constitution and State Courts" if "the [trial court] finds that the probative nature does in fact outweigh the prejudicial nature." The trial court then issued a preliminary ruling stating the propensity evidence was "likely to come into evidence" and that Watson "should be ready to counter that evidence or at least plan on having some of that heard."

Following the hearing, Watson filed a written objection, which he intended to rely upon at trial, relating to the admission of the propensity evidence under Article I, Section 18(c) of the Missouri Constitution. Having already issued its preliminary ruling on the topic in response to Watson's motion in limine, the trial court did not again take up the objection prior to trial.

On May 22, 2022, a five-day jury trial commenced during which the following facts relevant to this appeal were adduced:

Watson is Victim's natural father. In August of 2020, Victim lived with Watson, her stepmother, her three biological siblings, and her two stepsiblings. On August 16, 2020, Victim, who was then twelve years old, was spending the night at a neighborhood friend's house when she confided in her friend's parents that "[Watson] ha[d] raped [her] since the fourth grade." Law enforcement was immediately contacted, and it was confirmed that Victim would sleep at the neighbors' house that evening.

3

Later that night, Victim's stepmother went to the neighbors' house and spoke with Victim. The neighbors overheard Victim crying and Victim's stepmother say, "[i]f you go through [with] this, you will destroy the family."

The next morning, a detective and an investigator with the Missouri Department of Social Services ("DSS") interviewed Victim and Victim's biological siblings. Victim recanted her allegation and stated to the detective that the most important thing was that all the kids remain together and not go back to their birthmother. All of Victim's siblings echoed Victim's statement about the importance of keeping the family together "almost verbatim." The detective also interviewed the step-mother who "basically said that she didn't believe anything had happened" and also stated that the kids needed to remain together and not return to their birthmother. Due to the obvious similarities in these statements, the detective wrote in his report that the family members had been "coached."

Despite his assumption that the family members were coached, the detective did not follow up on his hunch, nor did he order Victim to a SCAN[2] clinic to undergo a medical examination that could provide physical evidence of whether Victim had ever been sexually penetrated.

Fearing for Victim's safety and the lack of intervention by law enforcement and DSS, V.W. and T.W. contacted the detective to disclose their prior abuse by Watson because they wanted Victim to be "taken seriously." During their phone call with the

---

[2] SCAN stands for Safety, Care, and Nurturing and is a clinic that is part of the Children's Mercy hospital system. *Safety, Care & Nurturing Clinic*, CHILDREN'S MERCY KANSAS CITY (last visited May 16, 2024). https://www.childrensmercy.org/departments-and-clinics/child-adversity-and-resilience/safety-care-and-nurturing/.

detective, V.W. and T.W. urged the detective to get the children "out of [Watson's] house." These pleas did not initially result in Victim's removal from Watson's house, but Victim and her biological siblings were eventually transferred to their biological mother's custody by temporary court order, after which they began living with their maternal grandmother and aunt, Ta.W.

At some point after this custodial transfer, Victim and her siblings were scheduled to visit Watson when Victim started crying and told Ta.W. that something did, in fact, happen with Watson. Victim did not go back to Watson's house at that time. At a second forensic interview, Victim disclosed that Watson had raped her when she was ten or eleven years old. Victim stated she was helping Watson clean his bedroom when Watson picked her up and took her into an adjoining bathroom, put her down on a bathmat, removed her pants, kissed down her chest, stomach, and vagina and proceeded to "[st[ick] his part inside of [her]," putting his penis in her "privates." Victim stated she cried, pushed Watson away, and told him to stop, but he held her down and then turned her over and put his penis "in her butt." Victim stated that Watson continued to thrust in and out until he finally stopped and told her he needed to "clean up some white stuff off his part and off of the floor" and that she felt something wet in her underwear when she put it back on. Victim also relayed numerous incidents of digital penetration and oral sex. A recording of the forensic interview was admitted into evidence and published to the jury.

Victim also testified about the details of the rape at trial. Victim testified there were five other people in the house when Defendant raped her, including three of her

5

siblings outside the bedroom door and two of her siblings below her bedroom in the basement. Victim testified that she initially recanted her allegations because her stepmother expressed that she did not believe Victim and because Victim did not want to "tear [their] family apart."

Watson attempted to attack Victim's credibility by asserting a defense that Victim was a "liar" and that she made up the rape to get back at Watson for "dress[ing] her down" in front of her friends on the same day she told her neighbors about the rape. Watson called Victim's biological siblings as defense witnesses, all of whom testified that Watson had never behaved inappropriately with them and denied hearing Victim scream during the rape.

To corroborate Victim's testimony, the State presented its propensity evidence. V.W., the biological sister of Watson, was the first propensity witness called. Before her testimony began, Watson reiterated his objection stating: "Judge, I think we're going in the direction of the information that I've already objected to, and I filed a written objection . . . . If I don't make my objection now, I lose it." The trial court stated, "The record will reflect that that objection is made appropriately and is an ongoing objection and is overruled."

V.W. proceeded to testify that when she was nine or ten years old, Watson, then seventeen, "grabbed [her while she was cleaning her room], and pushed [her] against the bed and flipped [her] so that [she] was on [her] back and got on top of [her][,] [a]nd . . . put his hand over [her] mouth and started humping [her]." V.W. further testified that when she was in the fifth grade, Watson pulled her underwear down and started kissing

6

her vagina and "doing stuff down there." V.W. also testified about additional incidents during the same time frame where Watson kissed her and touched her vaginal area while they were sitting next to each other in the living room.

On cross-examination, defense counsel asked V.W. why she did not report the abuse earlier. V.W. testified she told her parents about the abuse but they did nothing apart from talking to Watson about it once. V.W. testified that Watson apologized years later "for what he did" and stated that "he thought that [she] liked it."

The State also called Watson's brother, T.W., and maternal aunt, Ta.W., as propensity witnesses. Before each of their testimony about Watson's prior acts of abuse, Watson renewed his objection to the admission of propensity evidence. The trial court overruled both objections.

T.W. testified that about twenty years prior—when T.W. was between ten and twelve years old and Watson was between fifteen and seventeen years old—"[Watson] tried to stick his penis in [T.W.'s] butt." T.W. testified that "another time[,] when [he] was sleeping, . . . [Watson] tried to do it again and tried to kiss [him], [b]ut [h]e like clinched [his] butt closed and turned [his] head every time, and [Watson] ended up ejaculating on [his] butt." T.W. testified he was aware Watson abused his sister, V.W., because he witnessed one incident where Watson was on top of V.W. and another incident where Watson was on his knees in front of V.W. with his arms around her.

On cross-examination, defense counsel confirmed that T.W. never told his parents or any authority figures about the abuse. T.W. stated he did not report his abuse after it happened because he had seen "the way [his parents] handled it with [his] sister."

7

Finally, the jury heard from Ta.W., who testified that "[o]n multiple occasions [in the past], [Watson] . . . touched [her] and made [her] touch him." She testified the first incident occurred in the summer of 2010, when she was fifteen and Watson was twenty-five; Watson started rubbing her thigh while they were seated together on a sofa. Ta.W. testified that during that same summer, Watson climbed on top of her and "rubb[ed] himself on [her]" during a camping trip, and that on a third occasion, Watson made her touch his penis through his pants while Watson was driving. Ta.W. testified about additional incidents when she was sixteen: one incident where Watson made her touch his penis under his jeans; a second incident where Watson tried unsuccessfully to put his penis in her "butt" after climbing on her while she was lying on a sofa; and a third incident where Defendant put his penis in her mouth.

Defense counsel elicited on cross-examination that Ta.W. did not tell her father or her sister, Victim's biological mother, about the abuse. Ta.W. stated she did not tell the police about the incidents at the time because she was scared and embarrassed.

At the conclusion of evidence, the trial court explicitly instructed the jury in Jury Instruction No. 5 on how the propensity evidence could be considered:

> The defendant is on trial only for the offenses charged[.] You may not find the defendant guilty only because you believe he may have been involved in or committed other offenses or bad acts in the past[.]
>
> If you find and believe from the evidence that the defendant previously was involved in or committed other offenses or bad acts, you may consider such evidence only for the purposes stated in this instruction[.]
>
> As to Counts I and II, if you find and believe from the evidence that the defendant previously committed other criminal acts of statutory rape,

8

statutory sodomy, or child molestation, you may consider that evidence for the purpose of corroborating the victim's testimony and demonstrating that defendant's propensity to commit the offenses for which he is charged in Counts I and II.

During its closing, the State went over Instruction No. 5 again and emphasized to the jury that:

[T.D, T.W., and Ta.W.] are not the reason why you make this decision one way or the other, okay. Their purpose in testifying is about the credibility of [Victim's] story . . . [s]o when you determine who you believe, what you believe and why, what we're asking you to do is view their testimony in light of the fact that it makes [Victim's] testimony credible, not whether [Watson] did that to them.

The State also emphasized the need for propensity evidence in light of the fact that there was no physical evidence from a SCAN exam.

In his closing argument, defense counsel reiterated Watson's position that Victim was a "liar" and urged the jury to disbelieve the propensity witnesses because they were "popping up" with allegations of past abuse that were "never reported . . . to the authorities before." Defense counsel emphasized that "[s]ome of [the allegations] were 20-plus years old. Another one was a decade or more old."

The jury found Watson guilty of both charged offenses. On September 22, 2022, the trial court entered judgment sentencing Watson to twenty years in the Missouri Department of corrections on Count I and twenty years in the Missouri Department of Corrections on Count II, with the sentences to run consecutively to each other. Watson timely appeals.

## Points on Appeal

In his three points on appeal, Watson argues the trial court abused its discretion by allowing the State to introduce propensity evidence from V.W., T.W., and Ta.W. because such evidence was not logically or legally relevant in that any probative value was substantially outweighed by the danger of unfair prejudice. Upon careful review, we find no reversible error.

## Analysis

### A. Standard of Review and Section 18(c) of the Missouri Constitution

"The trial court 'has broad discretion to admit or exclude evidence during a criminal trial, and error occurs only when there is a clear abuse of this discretion.'" *State v. Ratliff,* 622 S.W.3d 736, 744 (Mo. App. W.D. 2021) (quoting *State v. Loper*, 609 S.W.3d 725, 731 (Mo. banc 2020)). The trial court abuses its discretion when its "ruling admitting or excluding evidence is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *Loper*, 609 S.W.3d at 731 (internal quotation marks omitted). "[I]f reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." *State v. Williams*, 548 S.W.3d 275, 287 (Mo. banc 2018) (alteration in original) (internal quotation marks omitted). This court reviews the decision of the trial court "for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *State v. Prince*, 534 S.W.3d 813, 818 (Mo. banc 2017) (internal quotation marks omitted).

"[P]ropensity evidence is evidence of uncharged crimes, wrongs, or acts used to establish that [a] defendant has a natural tendency to commit the crime charged." *State v. Boss*, 577 S.W.3d 509, 519 (Mo. App. W.D. 2019) (internal quotation marks omitted) (second alteration in original) (quoting *State v. Shockley*, 410 S.W.3d 179, 193 (Mo. banc 2013)). It is well established that "proof of the commission of separate and distinct crimes is not admissible unless such proof has some legitimate tendency to directly establish the defendant's guilt of the charge for which he is on trial." *State v. Primm*, 347 S.W.3d 66, 70 (Mo. banc 2011) (internal quotation marks omitted). "The law permits the State to try a defendant only for the offense for which he is on trial[,] and [t]his precludes the State from unjustifiably introducing evidence of a defendant's prior, uncharged crimes or bad acts." *State v. Garretson*, 598 S.W.3d 643, 653 (Mo. App. W.D. 2020) (alterations in original) (internal quotation marks omitted).

Our country's jurisprudence has generally prohibited the use of propensity evidence in criminal cases. *Williams*, 548 S.W.3d at 281. However, the enactment of Article I, section 18(c) of the Missouri Constitution carved out an exception to this general rule by relaxing the standard for the admissibility of propensity evidence in sex-abuse cases involving minors. *See State v. Matson*, 526 S.W.3d 156, 158 (Mo. App. W.D. 2017) ("The enactment of Article I, Section 18(c) effectively created a new evidentiary standard for sex crimes involving minors."); *State v. Lutes*, 557 S.W.3d 384, 390 (Mo. App. W.D. 2018) ("[I]n the context of sex crimes involving minors, [section 18(c)] unequivocally supersedes the Supreme Court of Missouri's evidentiary rulings that

11

once prohibited propensity evidence.") (internal quotation marks omitted) (quoting *Matson*, 526 S.W.3d at 158). Article I, section 18(c) currently provides:

> [I]n prosecutions for crimes of a sexual nature involving a victim under eighteen years of age, relevant evidence of prior criminal acts, whether charged or uncharged, is admissible for the purpose of corroborating the victim's testimony or demonstrating the defendant's propensity to commit the crime with which he or she is presently charged.

MO. CONST. art. I, § 18(c).

Essentially, section 18(c) "relieve[d] propensity evidence in certain types of cases from the absolute ban on admissibility, assuming logical and legal relevance is otherwise established."' *Lutes*, 557 S.W.3d at 390 (quoting *Matson*, 526 S.W.3d at 158). Thus, we must determine if the trial court abused its discretion in finding that the propensity evidence was (1) logically relevant—in that it tends to make the existence of a material fact more or less probable; and (2) legally relevant—in that it has probative value that is not outweighed by the danger of unfair prejudice. *Prince*, 534 S.W.3d at 817-18. ("Evidence is logically relevant if it tends to make the existence of a material fact more or less probable.") (internal quotation marks omitted); *Brummett v. Burberry Ltd*., 597 S.W.3d 295, 304 (Mo. App. W.D. 2019) (explaining that legal relevance weighs the probative value of propensity evidence against the danger of unfair prejudice to the defendant). The argument in Watson's appellate briefing does not assert that the propensity evidence in question entirely lacks logical relevance but rather challenges the evidence's probative value as part of his claim that it is not legally relevant.

**B.     Legal Relevance**

12

Watson argues, as he did below, that the propensity evidence is too dissimilar and too remote to have any probative value and that it is unduly prejudicial. We disagree.

"Before propensity evidence can be said to have any probative value, it must be sufficient for the jury to conclude the defendant actually committed the prior criminal act." *Williams*, 548 S.W.3d at 288. When a defendant pleads guilty to a prior criminal offense, this consideration is easily met because any doubt about culpability is removed. *Id*. at 289. In this case, Watson was never charged or convicted of any offenses against V.W., T.W., or Ta.W. However, section 18(c) clearly permits the admission of *uncharged* prior criminal acts, and the testimony of V.W., T.W., and Ta.W. was "specific, unequivocal, and sufficient for the jury to conclude that he actually committed the acts alleged." *State v. Brown*, 596 S.W.3d 193, 208 (Mo. App. W.D. 2020).

In considering the question of probative value, trial courts also examine whether a defendant "actually had a propensity to commit the charged crime at the time it is alleged to have occurred." *Williams*, 548 S.W.3d at 289. Factors to consider in this evaluation include "the similarity between the prior act and the charged act, the amount of time between the acts, and the prosecution's need for the evidence to prove its case." *State v. Robinson*, 662 S.W.3d 120, 126 (Mo. App. S.D. 2023) (citing *Williams*, 548 S.W.3d at 289). "[A]n inference of propensity might be proper notwithstanding a significant time lapse between the prior crime and the charged crime if the two crimes are highly similar." *Williams*, 548 S.W.3d at 289. "On the other hand, an inference of propensity might not be proper if the prior crime and the charged crime are only somewhat similar unless the two occurred over a short span of time." *Id*. Gaps between prior criminal acts and

13

charged conduct exceeding twenty years are not too remote to have probative value as long as requisite similarities are present. *See Lutes*, 557 S.W.3d at 391-92 (collecting cases and noting a number of courts have admitted evidence of sexual assaults occurring "over twenty years before the crime charged").

Here, while there was a significant time lapse of approximately nine to twenty years between the prior uncharged crimes and charged offenses, the uncharged crimes and charged offenses are very similar. All the uncharged crimes involved abuse of family members, and nearly all the uncharged crimes took place in the family home just as Victim alleged. T.W. and Ta.W. both described incidents where Watson pulled down their pants and attempted anal penetration—including attempts on T.W. that resulted in ejaculation. Similarly, Victim testified that Watson pulled down her pants and anally penetrated her to the point of ejaculation.

There are also notable similarities between V.W.'s testimony that Watson "grabbed [her], and pushed [her] against the bed and flipped [her] so that [she] was on [her] back and got on top of [her][,] [a]nd . . . put his hand over [her] mouth and started humping [her]," and Victim's testimony that Watson held her down before turning her over and putting "his part in her butt." V.W. and Victim also shared accounts of Watson kissing their genitals. Moreover, T.W., V.W. and Ta.W. were all minors or comparatively younger than Watson when the abuse took place, in fact T.W. and V.W. were the same age as Victim at the time the sexual misconduct took place.

Missouri courts have repeatedly deemed these types of similarities—similarities in age, familial relationship with the accused, and similar accounts of abuse—to be ***highly***

14

*probative* of a defendant's propensity to commit the charged offense. *See State v. Shepard*, 662 S.W.3d 761, 770 (Mo. App. E.D. 2023) ("[G]reat weight should be afforded to the similarities in the ages of [the propensity witness and the victim] and the fact they were not strangers to [the defendant] because it tends to show an ongoing propensity to engage in the charged crime."); *State v. Pierce*, 678 S.W.3d 115, 122 (Mo. App. S.D. 2023) ("We give great weight to the similarity of acts and ages of the victims."); *State v. Coyle*, 671 S.W.3d 702, 721 (Mo. App. W.D. 2023) ( "[T]he similarities in ages of [the propensity witnesses and the victim] at the time of the offenses against them, and [the defendant's] willingness to engage in sexual misconduct with victims he knows or is related to."); *State v. Robinson*, 662 S.W.3d 120, 126 (Mo. App. S.D. 2023) ("[T]his court notes the similarity of the acts to which [the propensity witness] testified and the acts for which Defendant was charged. Both victims were of a similar age at the time of the alleged inappropriate touching, both victims were relatives of Defendant, and both acts involved Defendant groping the victim's breasts."); *State v. Brammer*, 614 S.W.3d 18, 27 (Mo. App. E.D. 2020) (explaining that a defendant's past crimes were "highly probative" for showing a propensity to commit the charged conduct where "[b]oth involved young female victims, similar body parts, and similar accusations").[3]

---

[3] Nothing in this opinion is meant to suggest that *any* similarity between past acts and charged crimes satisfies the topic of probative value. As discussed, propensity evidence of acts that occurred years before the charged offense must be highly similar to be probative (i.e. shared characteristics involving age, relationship to defendant, place, manner of abuse, etc . . . ).

And, while evidentiary weight differs from case to case, *Williams*, 548 S.W.3d at 288, trial courts generally afford "great weight" where propensity evidence shows a defendant's abuse of minors known to him (e.g. family members) is not isolated, but rather, ongoing over a course of years. *See Shepard*, 662 S.W.3d at 770 (holding "great weight" should be afforded to propensity evidence showing a defendant engaged in inappropriate sexual conduct with one teenage girl whom he knew in the years leading to the rape of another teenage girl whom he also knew because it showed an "ongoing propensity" to molest young girls); *Lutes*, 557 S.W.3d at 394 (noting three past crimes twenty-one years removed involving the insertion of defendant's penis in young girls' vaginas had "considerable probative value" for showing his propensity to digitally penetrate his granddaughter) (quoting *Williams*, 548 S.W.3d at 292).

Ta.W.'s testimony concerning Watson's sexual abuse in 2010 and 2011, approximately eight years after his abuse of V.W. and T.W. and approximately nine years before that of Victim, shows Watson had an *ongoing* propensity to commit the charged offenses. *See State v. Peirano*, 540 S.W.3d 523, 529 (Mo. App. S.D. 2018) (holding that testimony showing a defendant molested his middle daughter approximately ten years after he stopped molesting his sister and eight years before molesting his youngest daughter demonstrated an ongoing propensity to molest young female family members). Additionally, all the propensity witnesses and Victim testified to multiple incidents of abuse rather than single isolated incidents.

The probative value was further enhanced by the State's need for propensity evidence to counter Watson's attacks on Victim's credibility, including arguments by the

16

defense that she was a liar because she previously recanted her allegations of abuse and that she had an alleged motive to fabricate allegations against Watson. *Williams*, 548 S.W.3d at 290 ("[T]he defense's attack upon the credibility of the state's witnesses, including [the] [v]ictim, enhanced the probative value of [Defendant's] prior crime evidence."); *Brown*, 596 S.W.3d at 209 ("The probative value of propensity evidence is enhanced where the only eyewitness to the sexual abuse is the victim, and the defense attacks the victim's credibility.").

And where, as here, there were no eyewitnesses to the abuse, and no medical or scientific evidence, such as a SCAN test, to corroborate Victim's account, the prosecution's need "*weighs heavily* in the [trial court's] decision for the probative side." *State v. Davison*, 636 S.W.3d 588, 592 (Mo. App. W.D. 2021) (emphasis added); *see also Williams*, 548 S.W.3d at 289 (holding that the trial court did not abuse its discretion in admitting the evidence in part because there were no eyewitness accounts and "[n]o other scientific, forensic, medical, or psychological witness was available") (internal quotation marks and citations omitted).

The culmination of these factors under the unique circumstances of this case lead us to conclude that the trial court did not abuse its discretion in determining that the propensity evidence had probative value.

## C. Prejudice

Turning to the question of prejudice:

> Several factors may bear on a [trial] court's analysis of the prejudicial effect of propensity evidence: whether the jury could infer the defendant was punished for his past criminal acts, how the State goes about

proving the prior act at trial, whether the charged crime is overshadowed by evidence of the prior act, and the manner in which the State uses the prior act at trial.

*Shepard*, 662 S.W.3d at 770-71 (citing *Williams*, 548 S.W.3d at 290-91).

While we agree with Watson that special attention must be accorded to the admissibility of evidence of prior *uncharged* crimes, *Williams*, 548 S.W.3d at 290 ("If the jury is allowed to infer (or, worse, speculate) the defendant escaped punishment in the past, it may be inclined to convict merely to punish the defendant for past criminal acts. . ."), it is equally clear that Article I, section 18(c), contemplates situations in which prior uncharged criminal acts may be admissible where relevant and the resulting prejudice is limited. *See Brown,* 596 S.W.3d at 208 ("Article I, section 18(c) . . . clearly allows for the admission of evidence of uncharged prior criminal acts."); *Prince,* 534 S.W.3d at 821 ("The plain language indicates the circuit court retains substantial discretion in admitting or excluding this evidence even if there is a danger of some prejudice."). We agree with the trial court that the prejudice was limited in this case and it was not an abuse of discretion for the trial court to admit the challenged testimony.

Throughout its presentation of evidence, the State *always* commented that Watson was *not* on trial for past uncharged crimes and instead was on trial for what he did to Victim.

Similarly, the trial court explicitly instructed the jury in Instruction No. 5 that "[Watson] *is on trial only for the offenses charged*" and that the jury "may not find [Watson] guilty only because [it] believe[s] he may have been involved in or committed other offenses or bad acts in the past[.]" (emphasis added). "Even though there might

18

have been a risk the jury may 'have been inclined to convict' [Watson] for his past uncharged criminal acts rather than for the crimes charged, . . . these risks are low given it would have contradicted the trial court's instructions, which we presume the jury correctly followed." *State v. Robertson*, 674 S.W.3d 153, 167 (Mo. App. E.D. 2023); *see also Shepard*, 662 S.W.3d at 771 ("Even if the jury was concerned about this, the risk that it was inclined to convict [the defendant] for past conduct rather than for the crime charged—disobeying the court's explicit instruction to the contrary—is low."). Under Missouri law, "[a] jury is presumed to follow the circuit court's instructions." *State v. Minor*, 648 S.W.3d 721, 731 (Mo. banc 2022).

Regarding other circumstances surrounding the propensity evidence in this case, we acknowledge the propensity evidence was introduced through live testimony, which can result in greater prejudice to a defendant than a stipulation for a prior conviction. *Williams*, 548 S.W.3d at 290. But "[l]ive testimony regarding prior bad acts is not *per se* unfairly prejudicial[.]" *Shepard*, 662 S.W.3d at 771 (citing *Brown*, 596 S.W.3d at 210). It is only when it is "graphic . . . , overly detailed, and not dispassionate" that the danger of unfair prejudice is increased. *Brown*, 596 S.W.3d at 210.

Nothing in the record before us suggests the propensity witnesses engaged in "theatrical drama or exaggerated sobbing" that could tilt the balance towards unfair prejudice. *State v. Banks*, 582 S.W.3d 919, 926 (Mo. App. E.D. 2019). Rather, the record indicates that V.W., T.W., and Ta.W., who were all adults at the time of their testimony, offered dispassionate, brief accounts of their sexual abuse by Watson with no testimony concerning their feelings on the matter. *See Coyle*, 671 S.W.3d at 723 (finding

19

no abuse of discretion where the propensity witness's testimony was "limited to reporting [the defendant's conduct] . . . with virtually no discussion of [her] feelings"). Defense counsel even remarked in his closing that Ta.W. didn't display any "pain" during her testimony and testified "like she's reporting the weather."[4]

Moreover, Victim's evidence of the charged offenses was not eclipsed by the propensity testimony—which concerned "less heinous crime[s]." *Williams*, 548 S.W.3d at 290. Victim described a forcible rape where she was held down by Watson while he vaginally and anally penetrated her, while the propensity witnesses described incidents of clothed "humping" and anal penetration *attempts*. Therefore, the testimony of the propensity witnesses is not so jarring that we can conclude Watson was unduly prejudiced by its admission.

Finally, our review of the record shows the State properly employed the propensity evidence to corroborate Victim's account of the rape; to rebut attacks on her credibility based on her initial lack of reporting and her siblings' testimony that they did not hear Victim scream; and to demonstrate Watson's propensity to commit the charged offenses due to the similarities between Victim's testimony and the uncharged crimes. Because the State's use of the propensity evidence was limited to its proper purpose, the danger of unfair prejudice was lowered. *See Shepard*, 662 S.W.3d at 772; *Coyle*, 671 S.W.3d at 724; *Robertson*, 674 S.W.3d at 169.

---

[4] Compare these facts with *Brown*, where we held the danger of unfair prejudice was increased where a propensity witness testified about how her sexual assault by the defendant caused her to drop out of school and feel angry and depressed many years removed from the incident. 596 S.W.3d at 210.

Watson argues we must nonetheless reverse because there is no indication the trial court considered any of "the relevant factors" herein discussed or "engaged in the balancing required by Article I, Section 18(c)."  Watson essentially takes the position that the trial court should have made a pretrial balancing-analysis ruling on the admission of the propensity evidence after his written objection was filed.  But a trial court "is not required to make an express finding of legal relevance before admitting evidence under article I, section 18(c), provided the record reflects a sound basis for the balancing the amendment requires."  *Williams*, 548 S.W.3d at 286.

The trial court conducted a hearing on Watson's motion in limine during which it was apprised of the content of the propensity witness testimony and the parties' arguments for and against its admission.  The trial court then properly articulated the Article 1, section 18(c) standard for admission—that propensity evidence is allowed where its probative value outweighs the prejudicial danger to the defendant—and let Watson know that he should be ready to "counter that evidence or at least plan on having some of that heard."  Watson raised his arguments again via written objection, and the trial court acknowledged that filing before overruling the objection at trial.  The record reflects a sound basis for the balancing process section 18(c) requires, and accordingly, we find no abuse of discretion.

Watson's points on appeal are denied.

## Conclusion

The trial court's judgment is affirmed.

_____
Mark D. Pfeiffer, Judge

Cynthia L. Martin, Presiding Judge, and Edward R. Ardini, Jr., Judge, concur.